UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB 1 3 2018

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AMRIT JASWANT SINGH CHAHAL | Case No. 1:18-MJ-70<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, Jeffrey Weeks, being first duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for approximately 13 years. I am currently assigned to the FBI's Washington Field Office (WFO). As part of my assigned duties, I investigate possible violations of federal criminal law. I have also worked in the Cleveland office of the FBI. I have been assigned to squads that focus on the investigation of white collar crime in Cleveland and Washington, DC. During my career as an FBI agent, I have participated in numerous white collar investigations, and I have been the lead or co-lead agent in more than 20 of those investigations.

2. I make this affidavit in support of an application for a criminal complaint charging Amrit Jaswant Singh Chahal ("Chahal") with wire fraud, in violation of Title 18, United States Code, Section 1343.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint. Since this affidavit is submitted for the limited purpose of supporting the proposed complaint, I have not set forth each and every fact known or observed by me, or pertinent to this investigation. This affidavit instead is offered merely to establish the facts that I believe are

1

necessary to establish probable cause. The information provided is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other officials, law enforcement officers, and witnesses, and my review of records, documents, recorded communications, and other evidence obtained during this investigation.

4. Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that Chahal has committed wire fraud, in violation of 18 U.S.C. § 1343.

## BACKGROUND

5. The FBI is investigating a suspected investment fraud scheme believed to be orchestrated by Chahal through a corporation he controls called The Kane Capital Investment Group, LLC (hereinafter "Kane Capital"). As explained in more detail below, the investigation thus far has uncovered evidence indicating that until very recently, Chahal was carrying out a "Ponzi scheme" where funds provided to Chahal and Kane Capital from new investors were used to pay older investors who were requesting the withdrawal of the older investors' funds. The investigation also has uncovered evidence that Chahal has created false financial documents and made material misrepresentations about the performance of his investors' funds to lull current investors into the false belief that their investments with Chahal and Kane Capital are performing well, when in fact Chahal has lost a substantial amount of his investors' funds. The investigation also has identified evidence that Chahal has used funds intended for the purpose of investment to pay his family members and to pay for Chahal's personal expenses.

6. Records from the Virginia Secretary of State show that Chahal formed Kane Capital as a limited liability company in December 2014. When Chahal initially registered Kane Capital with the Virginia Secretary of State, Chahal listed himself as the company's registered agent.

7. In February 2016, the registered agent for Kane Capital was changed to Chahal's

father, and the registered address for Kane Capital was changed to an address on Forest Drive in Fairfax, VA. A query of Fairfax County, Virginia, public records revealed that Chahal's father owns the residential property located at that same address on Forest Drive in Fairfax, VA.

8. Kane Capital maintains a webpage on Linked In, a professional networking website. Kane Capital's Linked In page states that it is a "private capital investment group based right outside the nation's capital in Fairfax, Virginia specializing in absolute return investments."

9. In or around July 2017, the Virginia State Corporation Commission ("VA SCC") began investigating Kane Capital and Chahal based on a referral from the Securities and Exchange Commission regarding suspected investment fraud. The VA SCC's investigation included, among other things, a preliminary analysis of the financial records of Kane Capital. That preliminary analysis found a pattern of money transfers consistent with a Ponzi scheme, where Chahal was using funds received from new investors to pay older investors. Moreover, the VA SCC's preliminary analysis identified numerous instances where Chahal had used investors' funds for personal expenditures or to make payments to family members.

## INVESTOR 1

10. Investor 1 is an individual located in New Jersey who invested funds with Chahal via Kane Capital beginning in 2016.

11. Investor 1 told your Affiant that he/she met Chahal in 2016 through a mutual acquaintance who told Investor 1 that the acquaintance had successfully invested funds with Chahal through his company, Kane Capital. Investor 1 spoke with Chahal, who stated that he (Chahal) trades oil, gold, and other commodities on behalf of investors. Based on these representations and the perceived successful experience of their mutual acquaintance, Investor 1 provided Chahal a check in the amount of $30,000 made payable to Kane Capital Investment Group LLC with a memo which read "Investment Account." Bank records show that Chahal

deposited this check into Wells Fargo Bank, N.A. account number ending in 6437 titled in the name Kane Capital Investment Group ("the Wells Fargo 6437 account").

12. A review of financial records shows that, in the eight days following the deposit of Investor 1's check for $30,000, Chahal expended the large majority of the funds from that check to issue payments to individuals who previously had invested in Kane Capital. Chahal expended the remaining funds related to that deposit on personal expenses, cash withdrawals, and a $1,000 deposit to TradeStation Securities, an online brokerage firm.

13. According to Investor 1, approximately four months after the first investment, Chahal informed Investor 1 that his/her original investment had more than doubled. This news caused Investor 1 to invest a further $150,000 with Chahal. Chahal instructed Investor 1 to send his/her check to TradeStation Securities and had Investor 1 sign some documents related to opening an account at TradeStation Securities. As noted below, a review of financial records shows that this $150,000 was used to open TradeStation Securities account 210-Z1795, which money was subsequently either lost through trading or siphoned off into accounts controlled by Chahal.

14. On November 6, 2017, Investor 1, who was cooperating with law enforcement, had a consensually recorded telephone conversation with Chahal. During the call, Investor 1 mentioned that he/she had a friend who was interested in investing with Chahal, but wanted to know what kind of return Chahal expected to make. Chahal replied that "we average between like 28% to 30, 34% return per year . . . usually more, but I like to average it out . . . ." Chahal also claimed, "Kane Capital is managing just over $5,000,000."

15. Chahal also stated that he was managing two accounts for Investor 1, explaining, "they're both TradeStation . . . one is your joint account with your [spouse] and one was your private account that you started first." Both before and after the recorded call on November 6,

4

2017, Chahal faxed Investor 1 documents that purported to be statements for two accounts at TradeStation Securities. One of these documents purported to be a statement for TradeStation Securities account 210-MTAVA held jointly in the name of Investor 1 and Amrit J. Chahal. This document lists a balance in that account as of October 27, 2017, of $71,077.63.

16. The other document purported to be an account statement for TradeStation Securities account ending in 1795 held jointly in the name of Investor 1 and his/her spouse. This document lists a balance in that account as of October 27, 2017, of $206,043.63.

17. Both of these documents were sent to Investor 1, who was located in New Jersey at the time, from facsimile number 844-367-9508 through a service called Faxburner. Faxburner is an online service that allows its users to send and receive facsimiles online through their email or from their smartphone. Records from Faxburner show that number 844-367-9508 was assigned to a username of admin@kanecapitalgroup.com, and that the service fees for the Faxburner account were paid via a credit card in the name of Amrit Chahal. Logs from Faxburner show that the user of this account accessed Faxburner's service on November 6, 2017, the same date that the faxes were sent from Chahal to Investor 1. Faxburner's logs and records from Verizon further show that these faxes were sent from an internet protocol address located at an apartment on Dixie Hill Road in Fairfax, VA. This address is an apartment rented by Chahal.

18. On November 9, 2017, I interviewed two representatives of TradeStation Securities, who informed me that 210-MTAVA is not a real account. They stated that the account ending in 1795 is a real account, but that as of October 27, 2017, it held a balance of $1,043.63.

19. The TradeStation Securities representatives further stated account ending in 1795 initially was funded with a check from Investor 1 for $150,000. The TradeStation Securities representative further explained that the funds in account ending in 1795 were depleted in part through trading losses and in part through multiple wire transactions out of that account and into

Ally Bank account number ending in 7334 in the name of Investor 1 and Investor 1's spouse ("the Ally Bank 7334 account"). The representative further advised me that TradeStation Securities has a policy whereby funds from a customer account can only be issued or wired to a like-titled account.

20. Investor 1 informed me that neither he/she nor his/her spouse ever opened a bank account at Ally Bank.

21. As noted above, during the November 6, 2017, recorded telephone call between Investor 1 and Chahal, Chahal stated that he manages just over $5,000,000 in client funds. A representative of TradeStation Securities informed me that, as of early December 2017, the accounts Chahal either owns or has third party access to have a combined balance of approximately $10,000.

22. On November 9, 2017, I interviewed a representative of Ally Bank, who stated that the Ally Bank 7334 account is an account in the name of Investor 1 and his/her spouse that was opened online in May 2017. The Ally Bank representative further stated that the funds in the Ally Bank 7334 account were depleted over time through wire transfers to Wells Fargo account 3855 in the name of Amrit Chahal ("the Wells Fargo 3855 account"). Financial records show that once the funds were deposited into Chahal's Wells Fargo 3855 account, they were spent on payments to earlier Kane Capital investors, payments to Chahal's father (who appears to himself be an investor), and on personal expenses. The Ally Bank 7334 account had approximately $2,500 remaining as of November 9, 2017.

## INVESTOR 2

23. Investor 2 is an individual located in New Jersey who invested funds with Chahal via Kane Capital beginning in 2016.

24. Investor 2 told me that he/she met Chahal in 2016 through a mutual acquaintance

who told Investor 2 that Chahal invested funds for both the acquaintance and others through Chahal's company Kane Capital. Investor 2 subsequently spoke with Chahal, who stated he trades oil using a computer program that enables him to trade over short time periods. On October 11, 2016, Chahal e-mailed Investor 2 from kanecapitalgroup@gmail.com and stated the following:

> Below are some links to general info on High frequency trading and the software that we use. I will follow up with a call, some of the info is very generalized, the jpeg below is of the world ranking of market timers and the software we use is currently #2 in the world, off by 8 points from #1!

25. To this email Chahal attached a screenshot of a Timer Digest report identifying the #2 ranked market timer as Fari Hamzei at HamzeiAnalytics.com. (Timer Digest is an online publication that monitors and ranks the performance of market timing models based on the performance of their recommendations. Fari Hamzei is a well-known trader and author on the subject of market timing.) Also attached to the above-described email was a Kane Capital Client Registration Form which identified www.KaneCapitalGroup.com as the website for Kane Capital.

26. Based on the above-described representations and the apparently successful experiences of others known by Investor 2, Investor 2 provided Chahal a check dated October 19, 2016, in the amount of $10,000 made payable to Kane Capital Investment Group LLC with a memo which read "Primary Deposit." Chahal deposited this check to the Wells Fargo 6437 account in the name of Kane Capital on October 24, 2016. Bank records show that, the same day that Investor 2's funds were deposited, Chahal expended virtually all of those funds by issuing a check payable to Chahal's father (an apparent investor) in the amount of $9,900. The remaining money was spent on personal expenses and transfers to other accounts controlled by Chahal.

## COMMUNICATIONS WITH FBI UNDERCOVER EMPLOYEE

27. In November 2017, an FBI undercover employee ("UCE"), posing as a potential investor, was introduced to Chahal. During their first conversation, which was recorded, Chahal

informed the UCE that Chahal currently had approximately 49 investors and that over the last four years he had obtained an average rate of return of between 28% and 32%.

28. The UCE had a follow-up recorded meeting with Chahal on December 7, 2017. During the meeting, Chahal told the UCE that he has not had any clients lose any money and guarantees investment principal for all his clients.

29. Chahal showed the UCE a document purporting to be an account statement for Investor 1 which indicated a current balance of approximately $88,000. He stated that Investor 1 provided him additional funds after he did well with Investor 1's initial investment. He stated that he doubled Investor 1's investment in approximately a year and a half and that such a return is typical for futures investments.

30. Chahal also told the UCE that TradeStation Securities is the only platform he utilizes to trade client funds, and that all his clients utilize TradeStation Securities.

## ANALYSIS OF FINANCIAL ACCOUNTS

31. I have obtained and analyzed account records for bank and brokerage accounts associated with Chahal and Kane Capital. This analysis has identified more than $1.2 million in funds provided to Chahal from individuals that I believe to be investors, based on interviews of several investors, notations or memo lines referencing investments or similar language on various payments, and similarities among the transactions.

32. Despite representing to at least two investors that he would invest their funds on their behalf, the records show that significant trading conducted by Chahal was done through personal brokerage accounts titled in Chahal's name. Other funds received into accounts for Chahal and Kane Capital were ultimately used to pay personal expenses and make payments to individuals who had previously paid money into Kane Capital – and thus appear to be other investors.

8

33. Based on the account records received to date, Chahal appears to have begun receiving investor funds by at least February 2015. It is therefore likely that Chahal and/or his associates began soliciting investors prior to this date. To date, the investigation has identified over 50 individuals believed to be investors, some of whom provided money on several different occasions to Chahal and/or his entities.

34. After investors would transfer the money to him or accounts that he owned/controlled, Chahal would often transfer those funds into other, personal accounts titled in his own name. For example, an individual named CL caused $42,000 to be deposited into the Wells Fargo 6437 account in the name of Kane Capital in December 2015. The memo on the check in question listed the purpose as "investment #3." One day after the money was deposited, $30,000 was transferred into a personal bank account in Chahal's name, and from there it was transferred to a TradeStation Securities account in the name of Chahal.

35. Brokerage account records show that Chahal's trading activity resulted in significant losses, which was not disclosed on the Kane Capital website, or in soliciting the UCE, who was posing as a prospective investor. Chahal has exhibited a pattern consistent with "day trading," in which he placed a high volume of trades in high-risk options and futures. In his Kane Capital account at TD Ameritrade, for example, Chahal's total net deposits for the year 2015 of approximately $207,000 were reduced by approximately 86% through losing trades and account fees. In the year 2016, that same account's net deposits of roughly $20,000 were reduced by approximately 98% through losing trades and account fees.

## PAYMENTS TO INVESTORS

36. Chahal also used new investor funds to pay earlier investors. Based on my training and experience, I know that individuals who are misusing investor funds will often seek to conceal the existence of the fraud and scheme by making lulling payments to earlier investors, in order to

9

create the appearance that the investments are earning the reported returns. The distributions in this case are consistent with a "Ponzi" scheme. The use of new investor funds to pay old investors was not disclosed to either Investor 1 or Investor 2. In both those investors' cases, the vast majority of their initial investments were used to pay earlier Kane Capital investors.

## SUMMARY OF ADMISSIONS BY CHAHAL

37. On or about January 4, 2018, another Special Agent with the FBI and I interviewed Chahal at his apartment on Dixie Hill Road in Fairfax, VA. At the beginning of the interview, Chahal claimed, among other things, that Kane Capital achieved a return of approximately 28% in 2017. Chahal also initially denied ever using new investors' money to pay old investors, and stated that to do that "would be a Ponzi scheme."

38. As the interview progressed, Chahal was confronted by the interviewing agents with evidence indicating that his prior statements during the interview had been false. Chahal then admitted that he had lied. Without cataloguing every statement made by Chahal during this interview, Chahal orally admitted, among other things, that: (i) he had lost all of the money people invested with Kane Capital; (ii) he had not told investors the truth; (iii) he had used newer investors' funds to pay back other investors without their knowledge or authorization; (iv) he had created fake TradeStation statements which he had provided to various investors; and (v) he opened an account at Ally Bank in the name of Investor 1 without Investor 1's knowledge or consent.

39. Chahal also gave a detailed written statement, acknowledging, among several other things, that "[a]t least early to 2016 and all of 2017, I had been lieing [sic] to investors about their returns and lieing [sic] to new clients about my returns and their future profits. I was using new client money to pay former clients who required a withdrawal while still reporting a profit through statements I was creating."

10

40. On February 9, 2018, I interviewed Investor 3. After the interview, Investor 3 sent me a series of emails regarding Chahal. In one of those emails, Investor 3 advised me that he/she had learned from Chahal's brother within the last few weeks that Chahal was intending to move to India.

## CONCLUSION

41. Based on the foregoing, as well as the training and experience of other law enforcement agents with whom I have spoken and my own experience, I respectfully submit that there is probable cause to believe that Chahal has committed wire fraud, in violation of 18 U.S.C. § 1343.

Respectfully submitted,

_____
Jeffrey Weeks, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on the 13th of February, 2018.

_____/s/_____ JFA
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge

11